IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 19-636-6 |
| | : | |
| JAMEL COVINGTON | : | |

**MEMORANDUM**

**Chief Judge Juan R. Sánchez**                                                                 **December 6, 2021**

Jamel Covington is charged with participating in a violent drug trafficking conspiracy. He now moves to suppress firearm and narcotics evidence seized from his U-Haul storage unit in Chester, Pennsylvania. In the affidavit for the warrant to search the unit, a Chester Police Department officer stated that a police dog searched the facility and alerted to the presence of narcotics inside Covington's unit. Covington argues the dog search was unreliable and ambiguous, and without the dog's supposedly positive alert, the investigators lacked probable cause to search the unit.

The Court finds the dog search was reliable because the handler was not biased, and the dog was not cued. The affiant officer did not make deliberate false statements or act with reckless disregard in describing the search. Because the totality of the circumstances, including the dog search, demonstrates the investigators established probable cause for the physical search, the Motion is denied.

**BACKGROUND**

On October 23, 2019, a federal grand jury sitting in the Eastern District of Pennsylvania returned a 68-count indictment against thirteen defendants known collectively as the "3rd Bone Drug Trafficking Group" ("3rd Bone DTG"). The indictment alleges the group perpetrated violence and trafficked narcotics in Chester, Pennsylvania and the surrounding area.

Jamel Covington is an alleged member of the 3rd Bone DTG and was charged with conspiracy to distribute 280 grams or more of cocaine base (crack), 28 grams or more of cocaine base, cocaine, fentanyl, and heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), (b)(1)(B), and (b)(1)(C) (Count 1); distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and (b)(1)(C) (Count 66); unlawful use of a communications facility in furtherance of a drug felony, in violation of 21 U.S.C. § 843(b) (Count 54); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count 67); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 68). Many of the charges stem from the search of his storage unit, during which officers found significant quantities of narcotics and stolen firearms.

The Court held a suppression hearing on September 8–10, 2021. The Court denied the suppression motion on September 24, 2021, as this case was scheduled for trial on October 4, 2021.[1] Covington and the remaining defendants then entered guilty pleas. This Memorandum follows and provides the Court's findings of fact and conclusions of law.

**FINDINGS OF FACT**

The Delaware County Drug Task Force was conducting an investigation of Jamel Covington and other alleged members of the 3rd Bone DTG in 2019. The Task Force consisted of local law enforcement officers as well as agents from the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA). In July 2019, a confidential human source (CHS) approached Chester Police Department Officer Timothy Garron—a member of the Task Force—and volunteered to assist with the investigation of Covington. The CHS was previously arrested on narcotics and firearms charges. The CHS told Task Force officers the CHS knew

---

[1] *See* Fed. R. Crim. P. 12(d).

Covington was involved in trafficking large quantities of narcotics and that the CHS personally purchased ounce-level quantities of cocaine from Covington in the past. Officer Garron and the CHS planned to make a controlled purchase of narcotics from Covington.

On September 18, 2019, the CHS called Covington at approximately 11:00 a.m. to arrange the buy. The CHS informed Officer Garron that Covington agreed to sell 28 grams of cocaine for $1,300. Covington and the CHS agreed to meet at a residence in Upper Chichester, Pennsylvania approximately one hour later to complete the sale. Officer Garron travelled with the CHS to the sale location while other Task Force investigators surveilled a residence at 1103 Weigand Street in Chester, Pennsylvania. Investigators believed Covington was present at this location that morning and frequently used the residence to distribute narcotics. *See* Tr. Day 3 22:16–23:17. Officer Garron stayed with the CHS at the Upper Chichester location while a team of investigators waited for Covington to leave 1103 Weigand Street. Other investigators were spread out in the area between the two locations. The Task Force maintained continuous surveillance on Covington through the day.[2]

Covington departed 1103 Weigand Street at approximately 12:00 p.m. However, he made several unexpected stops on his way to meet the CHS in Upper Chichester.[3] He first drove to a residence on the 2100 block of West Second Street. Officer Garron was familiar with this location

---

[2] Officer Garron testified that he remained alongside the CHS on September 18, 2019, but that he was in constant communication with other Task Force officers who personally observed Covington with no gaps in surveillance. Tr. Day 3 24:3–24. The Task Force used a "bridge line," which is a conference call line, to communicate with each other during the operation. *Id.* The Court finds Officer Garron's testimony credible in this respect and credits his account of the surveillance operation.

[3] Investigators expected Covington to drive directly to meet the CHS. The fact that Covington also made a series of short stops at known drug trafficking locations raised suspicion that Covington was distributing higher quantities of narcotics. *Id.* at 24:25–13.

and believed Covington and other 3rd Bone DTG members used this location to traffic narcotics. *Id.* at 26:15–24. Covington left the house several minutes later.

Covington then arrived at a U-Haul storage facility at 1600 Highland Avenue, Chester, Pennsylvania.[4] He entered the facility and parked outside of a row of units. He unlocked a unit and went inside for several minutes.[5] As Covington left the facility, he called the CHS on a mobile phone and asked the CHS whether the CHS had a digital scale. Covington then made two short stops at residences in the area and went to a local sports bar for approximately one hour before arriving at the CHS's location in Upper Chichester. The CHS entered Covington's vehicle and purchased 28 grams of cocaine from Covington as planned.

Task Force investigators believed Covington was using the storage unit to store narcotics after observing the series of short stops Covington made on his way to deliver narcotics to the CHS. *See id.* at 42:9–43:7. Storage units are commonly used in drug trafficking because of their anonymity and security. *Id.* In an attempt to establish probable cause to physically search the unit, the Task Force sought a search warrant for U-Haul's customer records. Officer Garron drafted the affidavit of probable cause in which he summarized the events of the day. *See* Gov.'s Ex. 13. The warrant was issued the same day.

U-Haul's records confirmed Covington was the customer of record for U-Haul storage Unit 416. *See* Gov.'s Ex. 14. This was the unit investigators observed Covington access earlier that

---

[4] The U-Haul facility is an outdoor space with rows of single-story units. The rows are separated by paved asphalt alleys large enough for customers to drive through and park directly outside their rented unit. *See* Gov.'s Ex. 6. To access a particular unit, a customer must provide a security code or use an access card at the gate. Units are rented on a month-to-month basis. Covington's unit and the other units in its row are each 10' x 15' x 10' in size. *See* Gov.'s Ex. 14.

[5] The unit that investigators later learned to be Covington's was in a row of 35 units on one side and 49 units on the other side. *See* Gov.'s Ex. 6.

day. The investigators then decided to bring a police dog to search the area immediately outside Unit 416 before seeking a warrant to physically search that unit. The investigators contacted Chester Police Department Officer William Murphy, who arrived soon after with his police dog "Chase." Officer Murphy and Chase searched the row of units containing Units 402–416. Chase alerted for the odor of narcotics inside Unit 416.[6]

Officer Garron drafted an affidavit of probable cause to search Unit 414 and Unit 416. The affidavit summarized the details of the day's surveillance operation and stated U-Haul's records confirmed Covington was the customer for Unit 416. The affidavit then stated,

> [A]n open air drug sniff was requested. Ofc. Murphy and his K-9 partner "Chase" arrived on location at 1600 Highland Avenue, Chester Pennsylvania 19103 to conduct an open air sniff of the storage facility. Ofc. Murphy deployed K-9 Chase where Ofc. Murphy advised that Chase indicated to the presence of narcotics from within storage Unit 416. Ofc. Murphy further advised that K-9 Chase indicated for the presence of narcotics from within Storage Unit 414 as well as 416.

Gov.'s Ex. 6, 15. The warrant was issued the same day. The investigators then searched Unit 414 and Unit 416. Inside Unit 416, investigators found approximately 150 grams of cocaine base (crack), six grams of cocaine, 100 grams of fentanyl, seven pounds of marijuana, and eleven loaded firearms, many of which were stolen. Tr. Day 3 76:17–24; *see also* Gov.'s Ex. 16.

---

[6] Officer Murphy testified that Chase did not alert on Unit 414. Tr. Day 1 214:19–20. Chase did a "little scratch" on Unit 414, but this was not an alert according to Officer Murphy. *Id.* at 199:1–10. Officer Murphy also testified that he does not recall telling any of the other investigators that Chase alerted on Unit 414, and based on his training and experience, he would not have said this. *Id.* at 217:6–23; *id.* at 266:1–9. The Court finds this testimony credible.

However, Officer Garron testified he was told that Chase alerted on Unit 414. Tr. Day 3 68:2–69:2. Therefore, it is unclear where in the chain of communication this inaccurate fact arose. The Court's factual findings regarding Chase's search of Unit 414 are discussed below. The veracity of Officer Garron's statement that Officer Murphy told him that Chase alerted on Unit 414 is discussed in the Court's conclusions of law.

5

Covington challenges this affidavit on several grounds. He contends (1) Chase's training was inadequate and he was an unreliable narcotics detection dog; (2) his alerts were ambiguous; and (3) Officer Murphy was biased towards the unit that he knew was Covington's and favorably interpreted Chase's behavior as an alert towards that unit and/or cued Chase to alert at that unit.

Chase was trained and certified by the National Police Canine Association (NPCA). Officer Murphy and Chase became partners in 2011 and soon thereafter completed a six-month, full-time training program hosted by the New Castle County Police Department in Delaware. *See* Gov.'s Ex. 1. They were certified in narcotics and patrol work by the NPCA and were then re-certified annually until Chase's retirement nearly ten years later. *See* Gov.'s Ex. 3.

Another organization called the Scientific Working Group (SWG) purports to measure the highest standards for working dogs.[7] SWG published a comprehensive set of standards and procedures called the SWGDOG Guidelines. These guidelines cover general working dog training principles as well as training protocols in specific areas such as narcotics detection. Def.'s Ex. 4, 5. They provide rigorous procedures for training, certification, and documentation "pertaining to all canine disciplines." Def.'s Ex. 4

The SWGDOG Guidelines are unquestionably more demanding than the NPCA training program. They are also more academic and research oriented. The NPCA, by contrast, is more

---

[7] Dr. Mary Cablk of Detection Science Solutions, LLC testified for Covington. Dr. Cablk is affiliated with SWG and offered her opinion that (1) The National Police Canine Association (NPCA) protocols do not meet best practices for police dog training, certification, and documentation, and SWGDOG Guidelines are the true representation of best practices; (2) Chase's NPCA training did not meet best practices and his search was therefore unreliable; and (3) Officer Murphy knew which units were being targeted and thus, his bias influenced Chase's alert. *See* Def.'s Ex. 1.

concerned with actual training for on-the-ground law enforcement.[8] The NPCA was established precisely because the SWGDOG Guidelines caused dogs and handlers to spend less time in training and in the field. While the SWGDOG Guidelines are more rigorous than NPCA's,[9] NPCA's training created workable, trustworthy, and consistent results in a practicable way.[10] The NPCA's approach is more concerned with regularly exposing dogs to real-life scenarios that they may encounter in the field. The NPCA also has a proven track record of producing reliable and accurate police dogs. Tr. Day 3 Afternoon 77:20–78:1; *id.* at 118:14–120:24. Chase's NPCA training was therefore sufficient.

Chase was also experienced. Chase spent approximately 80% of his time on duty in narcotics investigations with Officer Murphy. He was trained to detect heroin, methamphetamines,

---

[8] The Government offered Pasadena Police Department Sergeant (Ret.) Terry Anderson as an expert witness in the field of police dog training and operation. *See* Gov.'s Ex. 11.

[9] For example, SWGDOG requires "double blind" testing—where neither the handler nor the dog knows where the target odor is hidden. Tr. Day 2 Morning 12:11–14:3. SWGDOG Guidelines also require dogs train with a comprehensive list of drugs of a minimum potency and quantity from verified sources. *See* Def.'s Ex. 5. SWGDOG also has rigorous requirements for documentation. *See* Def. Ex. 4.

[10] Sergeant Anderson testified that routine training and exposure is more important in dog training and unnecessarily high standards like those propagated by SWG actually detract from a dog's time in training and in the field. *See* Tr. Day 2 Afternoon 82:4–14. For example, double-blind training requires more handlers, personnel, and space. *Id.* at 90:1–11. While organizations should strive to employ double-blind training where possible, requiring it in every instance is unrealistic and will necessarily limit a dog's exposure to different training scenarios. *Id.* at 124:14–125:13. The NPCA also recognizes that many law enforcement agencies do not have access to particular drugs in sufficient quantities or potency. One police department, for example, may have excess quantities of heroin because that community is particularly affected by that drug. A dog in that department may train more frequently with heroin rather than methamphetamines, for example. The fact that the dog is not certified to detect methamphetamine should have no bearing on its demonstrated and certified ability to detect heroin. *Id.* at 123:17–124:3; *id.* at 116:20–117:5. Finally, despite the differences between the NPCA and SWGDOG's documentation requirements, the NPCA's requirements adequately document the dog's history of training. *Id.* at 113:11–20; *see also* Gov.'s Ex. 1, 5.

cocaine, and marijuana. Chase's search of the U-Haul facility on September 18, 2019, was an "area search," in which Chase was tasked with detecting the odor of narcotics in the area where Officer Murphy commanded him to search. Officer Murphy and Chase developed a consistent procedure for these area searches. Officer Murphy would signal to Chase that they were beginning a search. Officer Murphy's operative command for this was "find seek." Officer Murphy would then let Chase lead the way and follow any target odors. Officer Murphy would repeatedly issue the "find seek" command as Chase followed his nose. Officer Murphy would allow Chase some liberty to follow any detected odors, but Officer Murphy would use leash corrections and verbal commands to maintain control over Chase and out of fear for Chase's safety. When Chase alerted for narcotics, Officer Murphy would reward the behavior by throwing Chase a toy, indicating the search was over and Chase had completed the mission. This was Officer Murphy and Chase's typical search procedure developed in training and practiced in the field. At the time of the search in this case, Officer Murphy and Chase had been partners for approximately eight years.

While objectivity in "alert behavior" is important, police dogs have different ways of notifying their handler that they sense narcotics. Tr. Day 1 120:7–11. Chase was an "aggressive alerter," meaning he communicated to his handler that he was "in odor" of narcotics by making an affirmative gesture. *Id.* at 120:21–121:3. More specifically, Chase would aggressively scratch with his front paws at the area in which he smelled the highest concentration of an odor he was trained to detect. *Id.* at 120:12–17. "Passive alerters," by contrast, simply freeze when they smell target odors and stare in the direction of the detected odor. *Id.* at 120:18–20. Whether a police dog is an aggressive or passive alerter is a trained behavior and has nothing to do with the dog's reliability. Instead, the handler must be trained to recognize the dog's alert behavior and handle the dog accordingly. *Id.* at 221:1–18. While police dogs and their handlers should strive for an objectively

clear alert methodology, there is an unavoidable degree of subjectivity and interpretation involved in odor detection. *See id.* at 222:14–22.

Officer Murphy was not biased and did not cue Chase to alert on Unit 416 during the search in this case.[11] Officer Murphy and Chase were tasked with searching a row of units.[12] This row contained every even-numbered unit between Unit 402 and Unit 470. *See* Gov.'s Ex. 6. Each unit directly abuts the units on either side; there are no gaps between units. Covington's unit, Unit 416, was therefore the eighth unit in the row.

Officer Murphy and Chase began the search in an area just before Unit 402.[13] Officer Murphy began by repeating the "find seek" command. *See* Vid. 0:00-0:05. Chase walked past the first four units, Units 402, 404, 406, and 408. *Id.* at 0:00-0:12. He gave no indication of an alert, although he did smell each unit. When Chase approached the fifth unit, Unit 410, he was ahead of Officer Murphy and the leash was taut. *Id.* at 0:12. Officer Murphy then issued another "find seek" command in a stern tone to retain control over the dog.[14] *Id.* Officer Murphy can also be heard saying "hey!" and "slow down!" *Id.* at 0:15. Chase then circled back beside Officer Murphy's hip outside Unit 410. In the video, this unit is the last of the orange doors. *See* Gov.'s Ex. 16. Unit 412

---

[11] The Court credits Sergeant Anderson's opinion regarding Chase's search of the U-Haul facility. The Court is also led to its conclusion because of Sergeant Anderson's experience in on-the-ground law enforcement as contrasted with Dr. Cablk's experience, which is extensive, but noticeably more academic and research oriented. *See* Tr. Day 2 Afternoon 77:20–85:12; *id.* at 28:24–32:21.

[12] Although the search ended when Chase alerted on Unit 416, the video footage shows there was a car parked outside Unit 420 and Unit 422. It is likely, therefore, that Officer Murphy believed the targeted unit was between Unit 402 and Unit 422.

[13] The Court's findings as to the search are based largely on video evidence of the search.

[14] Officer Murphy and both expert witnesses testified that it is frequently necessary to bring the dog under control by issuing verbal commands. The Court credits the witnesses' testimony on this point.

is the first of the blue doors. *Id.* While heeding Officer Murphy's correction, however, Chase continued to search in a crouched position with his nose low to the ground. Officer Murphy and Chase then continued the search with Chase on a shorter leash.[15]

Until this point, Chase had smelled the perimeter of each unit as he proceeded down the row. Officer Murphy issued another "find, seek" command outside Unit 412. *Id.* at 0:17 Officer Murphy also tapped on the door of Unit 412. *Id.* at 0:18-0:19 Chase thoroughly smelled the perimeter of Unit 412 but did not alert. *Id.* at 0:19.

As Chase approached Unit 414, he pulled the leash to its full length and lunged ahead of Officer Murphy. *Id.* at 0:22. He remained close to the wall of units but skipped Unit 414. Chase rushed to the near edge of Unit 416 and then to the far edge. *Id.* at 0:23-0:24. Officer Murphy issued another "find seek" command in a neutral tone. *Id.* at 0:24. Chase paused and turned his head and shoulders down the row of unsearched units. *Id.* He then returned his attention to the corner of unit 416, jumped to his hind legs and aggressively scratched on the door of Unit 416. *Id.* at 0:25. This was a clear and unequivocal alert.

In the moments immediately before Chase alerted on Unit 416, the leash was slackened, meaning Officer Murphy was not pulling or correcting Chase at that moment. Officer Murphy also did not verbally cue or correct Chase. By contrast, Officer Murphy had corrected Chase earlier in the search using the leash and verbal commands, but he did not do so in the moments before Chase alerted on Unit 416.

---

[15] Officer Murphy and both expert witnesses testified that dogs may be trained to conduct searches off the leash, and doing so has little effect on their reliability, so long as the handler can interpret the dog's alert. Officer Murphy also testified that he rarely let Chase off the leash in an urban environment like the City of Chester out of concern for the dog's safety. Officer Murphy and Chase frequently performed searches in situations that would be extremely dangerous for a dog to be off leash, such as a traffic stop on the side of a busy road. The Court credits this testimony and finds the fact that Chase was on a leash has no bearing on the reliability of the search.

At this point, Officer Murphy had not yet rewarded Chase with the toy. Chase therefore continued to search where he detected narcotics. Officer Murphy then bent over slightly and pointed to the left corner of Unit 414. *Id.* at 0:27. Chase scratched on the door but in a much less vigorous fashion than his alert on Unit 416. *Id.* at 0:28. Chase turned his attention towards Officer Murphy and rushed back to the same corner of Unit 416 and alerted in the same emphatic fashion. *Id.* at 0:29-0:34. Officer Murphy then threw Chase the toy and said, "good boy." *Id.* at 0:34-0:37. This concluded the search.

Covington claims Chase's ambiguous behavior between Unit 416 and Unit 414 means his alert on Unit 416 was invalid. The scratch on Unit 414, however, does nothing to invalidate Chase's alert. Chase was trained to recognize his toy as a reward for finding odors and a sign that his job was complete. Tr. Day 1 122:1–19; *id.* at 144:14–18. This is a regular part of dog training. Officer Murphy did not immediately reward Chase after his alert on Unit 416, even though Chase looked to Officer Murphy, which he had not done prior to that point.[16] Chase therefore continued to search the areas where he smelled narcotics. It is not uncommon for odors to travel through the air, which explains why Chase then scratched on Unit 414 before going back to alert on Unit 416 a second time.[17] In the moments after Chase's first alert on Unit 416—but before Officer Murphy threw the toy—Chase was simply continuing to communicate that he smelled narcotics. Tr. Day 1 198:9–199:5. This is consistent with the established search procedure. *Id.* at 144:9–145:9. Chase's

---

[16] Officer Murphy testified he did not know how many units were being targeted. Tr. Day 1 216:9–10. It was his standard practice to not reward Chase until he was satisfied that Chase had searched every potential source of odor. Tr. Day 1 144:9–145:9. Officer Murphy would normally want Chase to search all nearby rooms, or in this case, storage lockers. *Id.*

[17] No contraband was found in Unit 414. The Court credits Sergeant Anderson's testimony that odors often flow in the wind and, although Chase initially alerted in the most concentrated odor of drugs, his subsequent alert was simply the area in which smelled the highest concentration of drugs at that moment. Tr. Day 2 Afternoon 68:9–70:4.

actions between the first alert on Unit 416 and the point where he caught his toy were simply confirmation that he detected narcotics in Unit 416 and that the odors had permeated the air between Unit 416 and Unit 414.

Chase's NPCA training was adequate. His alert was clear and unequivocal. He was not cued, and Officer Murphy did not demonstrate any bias. Officer Murphy and Chase's search of the U-Haul facility on September 18, 2019, was therefore valid.

**CONCLUSIONS OF LAW**

Covington has failed to establish that the affidavit contained deliberate false statements or that Officer Garron acted with reckless disregard. Because the investigators established probable cause based on the totality of the circumstances, the search warrant was properly issued.

A defendant has a constitutional right to impeach for veracity an affidavit of probable cause. In *Franks v. Delaware*, the Supreme Court instructed, "[t]here is, of course, a presumption of validity with respect to the affidavit supporting the search warrant." 438 U.S. 154, 171 (1978). To mandate an evidentiary hearing on the matter, however, a challenger must state "allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof." *Id.* In the event the substance of the alleged falsity or reckless disregard is set aside, and the remaining evidence is insufficient to support a finding of probable cause, the defendant is entitled to a hearing in which the defendant must establish by a preponderance of the evidence that the affiant made deliberately false statements or acted with reckless disregard for the truth. *Id.* If a challenger meets this burden, and with the content of these statements set aside, the evidence was insufficient to establish probable cause, the evidence must be suppressed.

A "deliberate false statement" is "an untrue statement knowingly made with the intent to mislead" that is "intentional," "premeditated," or "fully considered." Blacks Law Dictionary (9th

ed. 2013). "Reckless disregard" is defined as "conscious indifference to the consequence of an act." *Id.*

Probable cause to search is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This is a "practical, nontechnical conception" based on "common-sense conclusions about human behavior." *Id.* at 231. It is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. The existence of probable cause, in short, must be determined by an analysis of the totality of the circumstances surrounding the intrusion.

The probable cause examination has two steps. *See Ornelas v. United States*, 517 U.S. 690, 696–97 (1996). The Court must first determine the "historical facts," or the events that occurred leading up to the search. *Id.* at 696. The Court must then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount . . . to probable cause." *Id.* Courts may accept the judgment of a law enforcement officer if it is backed by a warrant issued by a magistrate. *U.S. v. Watson*, 423 U.S. 411, 423 (1976) (citing the preference for warrants).

Facts supporting probable cause may come from the personal observations of officers—individually or as part of a surveillance operation by teams of investigators. *Brinegar v. United States*, 338 U.S. 160, 172 (1949); *see also Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *United States v. Golson*, 743 F.3d 44, 54–55 (3d Cir. 2014). Police officers may also use their experience, special training, and expertise to draw limited inferences of criminal activity from behavior that is not facially criminal. *Texas v. Brown*, 460 U.S. 730, 742–43 (1983); *United States v. Yamba*, 506 F.3d 251, 260 (3d Cir. 2007). Probable cause may be based on information from a

13

reliable, known informant or independent source, whose information can be independently corroborated. *Draper v. United States*, 358 U.S. 307, 313 (1959). Probable cause can be based on evidence discovered in plain view or during consensual searches and interviews. *See United States v. Stabile*, 633 F.3d 219, 241–42 (3d Cir. 2011); *United States v. Williams*, 898 F.3d 323, 331 (3d Cir. 2018). Finally, an informant's tip, in conjunction with a controlled drug buy or other indication of illegal activity, can provide probable cause. *United States v. Stearn*, 597 F.3d 540, 554–58 (3d Cir. 2010)

In *Florida v. Harris*, the Supreme Court applied the *Gates* probable cause analysis to canine-supplied probable cause. 568 U.S. 237 (2013). The Court rejected the notion that, "the [s]tate must in every case present an exhaustive set of records, including a log of the dog's performance in the field to establish the dog's reliability." *Id.* at 240. The Court instead expanded the *Gates* totality of the circumstances approach and stated,

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.
>
> A Defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretations we have discussed, [] may sometimes be relevant . . . And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause if, say,

> the officer cued the dog (consciously or not), or the team was working under unfamiliar conditions.

*Id*. at 246–47. The Supreme Court ultimately concluded, "[i]n short, a probable cause hearing focusing on a dog's alert should proceed much like any other." *Id.* at 247.

Officer Garron's affidavit contains inaccurate information. The challenged portion of Officer Garron's affidavit states, "Ofc. Murphy deployed K-9 Chase where Ofc. Murphy advised that Chase indicated to the presence of narcotics from within storage Unit 416. Ofc. Murphy further advised that K-9 Chase indicated for the presence of narcotics from within Storage Unit 414 as well as 416." Officer Garron is not a police dog handler. He has no professional experience handling dogs. The reason Task Force investigators called Officer Murphy was to rely on Officer Murphy and Chase's experience and training. Officer Murphy advised that Chase alerted on Unit 416. Officer Murphy believed, based on his years of experience as Chase's handler, that Chase alerted to Unit 416 and the alert was not a result of cuing or bias. The Court agrees based on the evidence and testimony presented at the suppression hearing.

Officer Garron's statement regarding Chase's alert on Unit 414, however, was not accurate. Chase did not alert to Unit 414, and Officer Murphy made no statement to that effect. Based on the evidence and testimony presented at the suppression hearing, it is not clear where this information came from. There were Task Force investigators on the scene while Chase performed the search. To an untrained eye, it may appear Chase alerted to Unit 414. But his behavior with respect to Unit 414 was simply a confirmation of his alert on Unit 416. Officer Garron's misstatement, however, was not made deliberately or with reckless disregard. The Court finds Officer Garron credible when he testified that he believed Officer Murphy advised that Chase alerted to Unit 414. Although Officer Murphy made no such statement, Covington has failed to prove by a preponderance of the evidence that Officer Garron acted deliberately or recklessly when

15

he included this information. Officer Garron's conduct therefore does not meet the requisite culpability required to strike that information from the affidavit.

Even if Chase's "alert" on Unit 414 were removed from the affidavit, however, the officers had still established probable cause to search Unit 416. Following the Supreme Court's guidance in *Florida v. Harris*, the Court has considered Chase's training and experience, and the evidence of the search in this case. Chase was trained by a bona fide organization, and his alert on Unit 416 was clear and unambiguous. Covington was given an opportunity the challenge Chase's reliability by cross examining Officer Murphy and Officer Garron and introducing his own expert witness. The Court finds Chase was reliable and the circumstances surrounding this particular search do nothing to undermine the case for probable cause.

Chase's alert was properly considered alongside with the balance of the affidavit. The Delaware County Drug Task Force was investigating Covington as part of a broader investigation into the 3rd Bone DTG. Investigators received information from a confidential human source that Covington had distributed large quantities of narcotics in the past. Investigators observed Covington sell 28 grams of cocaine to the CHS, corroborating the information the CHS supplied. Covington was observed making a series of short stops at locations the Task Force previously observed to be involved in the drug trafficking conspiracy. The CHS provided precise information about the vehicle Covington would use to distribute the drugs. Covington was observed accessing a U-Haul storage unit shortly before delivering the drugs to the CHS. A reliable drug detection dog unambiguously alerted for the presence of narcotics inside that unit. This amounts to probable cause and the issuance of the search warrant in this case was proper.

**CONCLUSION**

Covington has failed to prove by a preponderance of the evidence that Officer Garron made deliberate false statements or acted with reckless disregard in drafting the affidavit of probable cause. The information in the affidavit was therefore properly considered and established probable cause. The motion to suppress is therefore denied.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez, C.J.